UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

COUNTRY FARE LLC,                    :
    PLAINTIFF,                  :    CIVIL ACTION NO. 3:11cv722 (VLB)
                                :
    v.                          :    June 7, 2011
                                :
LUCERNE FARMS,                       :
    DEFENDANT                   :
                                :

## MEMORANDUM OF DECISION GRANTING THE [DOC. #3] PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

The Plaintiff, Country Fare LLC (hereinafter "Country Fare") seeks an order pursuant to Rule 65(a) preliminarily enjoining the Defendant, Lucerne Farms ("Lucerne") from interfering with Country Fare's use of the "Mainely Mulch" mark, and importation, sale and distribution of products under the "Mainely Mulch" mark [Doc. #3]. In particular Country Fare requests the Court to direct Lucerne to provide written consent, pursuant to 19 C.F.R. § 133.22(c)(3), to U.S. Customs and Border Protection Officials to the release and importation of products bearing the Mainely Mulch mark, produced and distributed by Semican International Inc. ("Semican") and Country Fare respectively. This action was prompted by detainment of a Semican/Country Fare shipment of mulch product by custom officials due to Lucerne's enforcement of its currently registered trademark to Mainely Mulch which Country Fare in turn claims was fraudulently obtained. The Court granted Country Fare's request for a Temporary Restraining Order on May 5, 2011, finding that the Plaintiff was likely to suffer immediate irreparable injury, loss and damage, in the form of loss of reputation, good will, and business

opportunities for which it could not be compensated monetarily, and the Defendant had committed the acts and harm alleged in the Plaintiff's Verified Complaint such that the equities and hardships weighed in the Plaintiff's favor, rendering it likely that the Plaintiff would prevail on the merits and that the public interest would not be disserved given the disputed basis upon which the trademark had been registered [Doc. #14].  The Defendant was therefore enjoined and restrained from interfering with the Plaintiff's use of the Mainely Mulch mark and importation, sale and distribution of products under the Mainely Mulch mark. The order instructed the Defendant to provide written consent and notice consistent with a letter template attached to the Order.  The parties jointly moved to amend the order on May 6, 2011 to alter the language of the consent letters, and the Court thereafter granted the parties' request for amendment [Docs. ## 17, 19].  The parties appeared before the Court pursuant to an Order to Show Cause on May 11, 2011.

During the hearing both parties presented exhibits and live witness testimony.  At the conclusion of the hearing, the Defendant sought to admit the testimonial declaration of Kevin R. Haley, trademark counsel to Lucerne, asserting for the first time that Haley was unable to attend the Show Cause proceeding.  The Plaintiff objected to the exhibit on the basis that it did not have an opportunity to cross-examine Haley.  The parties consented to a schedule for examining Haley by interrogatory and the Court extended the temporary restraining order for good cause pursuant to Federal Rule of Civil Procedure

2

**65(b)(2).**

**Facts**

The Court finds the following facts to have been proved by clear and convincing evidence.  Country Fare conceived a proprietary mulch composition consisting of a carefully proportioned mix of hay and straw.  [Testimony of Jeff Auerbach and Frederick Stecher, Doc. #25].  Country Fare later discovered that Lucerne manufactured an animal feed from grain using a heat process that Country Fare believed could be used to enhance its proprietary mulch composition. [*Id*.].  Country Fare discussed with Lucerne its proprietary mulch concept and asked if Lucerne could manufacture it's mulch using Lucern's heat processing equipment. [*Id*.].  Lucerne had made a substantial investment in its heating process equipment and it was underutilized when it was approached by Country Fare.  [Testimony of H. Allen White].

Country Fare and Lucerne entered into an agreement on December 20, 1999 (hereinafter the "Agreement") under which Lucerne agreed to manufacture, package and ship mulch pursuant to Country Fare's specifications.  [Plaintiff Exh. 1-B,D, Doc. # 3, Attach 1].  The mulch was manufactured using Country Fare's proprietary composition and packaged in bags both designed and supplied by Country Fare, Country fare paid approximately $2,300.00 for the plates used to make the bag design and Country Fare owned the plates and did not provide

Lucerne access to the plates.  [Testimony of Jeff Auerbach and Frederick Stecher, Doc. # 25].  The name Country Fare was prominently printed on the front and back of the bag, while Lucerne was identified on the back in smaller print as the manufacturer.  [Plaintiff Exh. 1-B, E, Doc. # 3, Attach 1].

All inquiries and complaints concerning the product were directed to Country Fare, including in at least one instance, a complaint that was made to Lucerne, which was in turn redirected to Country Fare. [Testimony of Jeff Auerbach, Doc. # 25;   Plaintiff Exh. 1-L, Doc. # 3, Attach 2].  In redirecting a customer's inquiry, Lucerne noted to the customer "Maine Mulch is a Country Fare product and therefore we are prohibited to do anything in the way of advertising, selling, etc. all must be done through Country Fare . . . ." [Plaintiff Exh. 1-L, Doc. # 3, Attach 2].

The Plaintiff provided convincing testimony that Country Fare conceived of the name for the product and that it was named "Mainely Mulch,"in recognition of the fact that the product was manufactured in the state of Maine where Lucerne was located. [Testimony of Jeff Auerbach and Frederick Stecher, Doc. # 25]. Although Lucerne claims to have conceived of the name, including the fact that Country Fare used the name on the plates it owned and contributed exclusively, virtually all of the evidence is to the contrary to this assertion.  [Testimony of Jeff Auerbach, Frederick Stecher, and H. Allen White, Docs. ##25-26].  The parties' Agreement identifies and describes Lucerne as the "manufacturer/supplier" of the bagged mulch product, while"Mainely Mulch" is described in turn as "Country

4

Fare's product." [Plaintiff Exh.  1-D, Doc. # 3, Attach 1].  It also states that Lucerne makes "Mainely Mulch" "exclusively for" Country Fare. [*Id*].  After selling "Mainely Mulch" for several years, Country Fare added the letters "TM" after the name "Mainely Munch" on the ground cover package by agreement of the parties to protect the mark.  [Testimony of Frederick Stecher, Doc. # 25; Plaintiff's Exh. 1-E, Doc. #3, Attach. 1].

The business relationship between the parties became strained and ultimately broke down.  Lucerne was disenchanted with Country Fare because it did not make timely payments, did not supply packaging timely and did not meet Lucerne's volume expectations.  [Testimony of H. Allen White, Doc. #26; Defendant's Exh. H, Doc. #22, Attach 9].  Prior to the termination of the parties' relationship, Lucerne expressed its dissatisfaction with Country Fare, but subsequently had a debilitating fire and Country Fare in turn cited quality control issues and objected to Lucerne's planned production of its own ground cover labeled "Mainely Mulch."  After the fire, Lucerne began manufacturing mulch under the name "Lucerne Farms Premium Ground Cover" which it advertised as being manufactured under the same high standards as "Mainely Munch." [Plaintiff's Exhs. M and N, Doc. #3, Attach. 2].

Unbeknownst to Country Fare, Lucerne anticipating a breakdown in the parties' business relationship, filed an application to register the "Mainely Munch" mark in its name. [Testimony of Jeff Auerbach, Frederick Stecher, and H. Allen White, Docs. ##25-26; Testimonial Declarations of Kevin Haley Doc. # 22,

5

Attach. 11 and Doc. #28; Defendant's Exhs. B-E, Doc. 22 Attach 3-6; Plaintiff's Exh. 1-F through K].   Lucerne's trademark registration application incorporated the package supplied and previously used in commerce by Country Fare, but with the prominent references to Country Fare deleted and a representation that the modified package was in fact "Lucerne Farms Premium Ground Cover," which it advertised as being superior to "Mainely Mulch," and was being used by Lucerne in commerce when in fact it had not been.   [Testimony of Jeff Auerbach, Frederick Stecher, and H. Allen White, Docs. ##25-26; Testimonial Declarations of Kevin Haley Doc. # 22, Attach. 11 and Doc. #28; Defendant's Exhs. B-E, Doc. 22 Attach 3-6; Plaintiff's Exh. 1-F through K].   The application was granted and the mark "Mainely Mulch" was registered in the name of Lucerne in July of 2004. [*Id.*].

Following the expiration of the parties' Agreement, Country Fare contracted with Semican, a Canadian company to manufacture mulch in the "Mainely Munch" bags previously supplied to Lucerne. [Testimony of Jeff Auerbach, Doc. #25].   On April 4, 2011, Lucerne recorded its trademark registration with U.S. Customs and Border Protection which resulted in the detainment of a truck load of Country Fare Mainely Mulch product at the Canadian border. [*Id.*, Plaintiff's Exh. 1-T, Doc. #3, Attach. 2].   Country Fare thereafter filed this action and requested a temporary restraining order [Doc. #1].

## Discussion

### *Standard for Preliminary Injunctions*

Historically, the standard for a preliminary injunction required a showing of "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Citigroup Global Markets*, v. *VCG Special Opportunities*, 598 F.3d 30, 35 (2d Cir. 2010).

Recent decisions however, reflect that the Second Circuit has changed the standard that it applies to preliminary injunctions.   Specifically, in *Salinger v. Colting*, 607 F.3d 68, 74-75 (2d Cir. 2010), the Second Circuit held that the standard for preliminary injunctions was "inconsistent with the 'test historically employed by courts of equity' and ha[d] therefore, been abrogated by the Supreme Court's decision in *eBay, Inc. V. MercExchange, L.L.C.,* 547 U.S. 388 (2006)."  As explained by the Southern District of New York:

> In *Salinger,* the court held that a preliminary injunction should issue upon a showing of the plaintiff's likelihood of success on the merits only where the plaintiff has only shown that: (1) he is likely to suffer irreparable injury in the absence of an injunction; (2) remedies at law, such as monetary damages, are inadequate to compensate for that injury; (3) the balance of hardships tips in his favor; and (4) the public interest would not be dis-served, by the issuance of a preliminary injunction*.*

*Rex Medical v. Angiotech Pharmaceuticals, Inc.*, 754 F. Supp. 2d 616, 629 (S.D.N.Y., 2010).

7

While the Second Circuit, in *Salinger*, stated that its holding applied to "preliminary injunctions in the context of copyright cases" the court also observed that it saw "no reason that *eBay* would not apply with equal force to an injunction in *any* type of case." *Salinger*, 607 F.3d at 78 n. 7 (emphasis in original).  As a result, the Southern District of New York has observed that the Supreme Court's decision in *eBay*, requires "the use of the Supreme Court's four-factor test in every case."  *Rex Medical* 754 F. Supp. 2d at 620; *see also New York City Triathlon*, *LLC v. NYC Triathlon Club, Inc.*, 704 F. Supp. 2d 305, 328 (S.D.N.Y. 2010).  The Court finds it unnecessary to conclude whether the Second Circuit's opinion in *Salinger*, extends to trademark-related disputes as is the subject in this case, as the Court finds that the Plaintiff meets its burden under either the earlier or more exacting standard articulated in *Salinger*.

*Analysis*

<u>Irreparable Injury or Harm and Inadequacy of Remedies at Law</u>

Upon assessment of the parties' filings and evidence presented at the Show Cause hearing, the Court finds that the Plaintiff has meet its burden and demonstrated a likelihood of irreparable harm, in the form of loss of goodwill and loss of business opportunities due to interruption of the Plaintiff's delivery of Mainely Mulch, its primary product accounting for the vast majority of its annual sales during its key delivery season.  In particular, Jeff Auerbach, the President of

8

Country Fare testified at the Show Cause hearing that the Mainely Mulch product accounted for 90% of its annual sales and that Country Fare would likely fail as a business without continued sales of the product, especially as the interruption of distribution of Mainely Mulch products pursuant to the enforcement of the Defendant's registered trademark is occurring at a key time of demand for its mulch products and that failure to meet outstanding orders will result in damage to the company's goodwill with and erosion of its existing customers and frustrate its efforts to secure new customers.  After the Show Cause hearing, Plaintiff submitted upon the Court's request additional memorandum and declaration regarding the calculation of the bond in which it clarified that Mainely Mulch historically represented 90% of Country Fare's gross sales, but in the periods from July 1, 2010 to December 31, 2010 and January 1, 2011 to May 19, 2011 sales of Mainely Mulch only accounted for 82% and 69% of gross sales respectively. [Testimonial Declaration of Jeffrey Auerbach Doc. #38].

The Second Circuit has clearly identified such harm as irreparable in nature:

> [I]n *Reuters Ltd. v. United Press Int'l*, 903 F.2d 904 (2d Cir. 1990), the Second Circuit concluded that United Press had shown irreparable harm because, if Reuters were allowed to terminate the parties' agreement, United Press would be unable to continue supplying its product (provided to it by Reuters) to its customers.  In that case, Reuters had contracted with United Press to provide it with foreign news photographs which United Press would later distribute to its customers.  In concluding that United Press had shown irreparable harm sufficient to warrant the issuance of an injunction, the court focused on the harm to United Press' reputation and the loss of goodwill, and noted that such an injury is "nearly impossible to

9

value."  In cases where a preliminary injunction has issued to prevent a product source from suspending delivery to a distributor, the irreparable harm has often consisted of the loss of customers and the competitive disadvantage that resulted from a distributor's inability to supply its customers with the terminated product.

*Rex Medical*, 754 F. Supp. 2d at 621-22 (citing *Reuters Ltd. v. United Press Int'l*, 903 F.2d 904 (2d Cir. 1990).  Further, the Second Circuit has noted an absence of irreparable harm in instances where the loss of goodwill was doubtful and the harm was easily calculable:

> Generally, where we have found no irreparable harm, the alleged loss of goodwill was doubtful, and lost profits stemming from the inability to sell the terminated product could be compensated with money damages determined on the basis of past sales of that product and current and expected future market conditions.  In contrast, where we have found irreparable harm, the very viability of the plaintiff's business or substantial losses of sales beyond those of the terminated product have been threatened.

*Tom Doherty Assocs., v. Saban Entm't Inc.*, 60 F.3d 27 (2d Cir. 1995) (internal citations omitted).

It is well recognized that the inability of a party to supply its products to customers as a result of a dispute will often result in a loss of goodwill sufficient to establish irreparable harm.  *Rex Medical*, 754 F. Supp. 2d at 621-22; *John B. Hull, Inc. v. Waterbury Petroleum Prods., Inc.*, 588 F.2d 24, 29 (2d Cir. 1978) (finding irreparable harm when "plaintiff is deprived totally of the opportunity to sell an entire line of merchandise and may incur injury to its goodwill and reputation as a 'dependable distributor'"); *Interphoto Corp. v Minolta Corp.*, 295

10

F. Supp. 711, 723-724 (S.D.N.Y. 1969)("it would be impossible to estimate or compute damages for the loss of goodwill [plaintitff] will suffer as a result of being unable to provide its retail customers with products").  Country Fare has presented evidence and testimony that its reputation and goodwill with its customers will be irreparably damaged to the extent it cannot deliver its Mainely Mulch products during its critical spring gardening season.  Mainely Mulch is a quintessential seasonal product and the inability to supply its customers during its peak season will lead to significant losses of goodwill.  In addition, Country Fare's goodwill and reputation is further jeopardized as a result of the confusion in the marketplace that could be caused by Lucerne's ability to sell its version of Mainely Mulch in virtually identical packaging to that in which Country Fare sold mulch for many years.

The Defendant contends that "Country Fare points only to the potential disgruntlement of existing customers as its potential injury not the loss of a major piece of new business" and that such harm can be repaired through compensatory relief.  In support the Defendant identifies *Dittman & Greer, Inc. v. Chromalox, Inc.,* 2009 WL 3254481*, at *1* (D. Conn. Oct. 6, 2009).  In that case, this Court applied the standard identified in *Saban*, and concluded that :

> Here, D & G presented evidence that Chromalox sales constituted
> more than a third of its business, measured in terms of sales and
> gross profits.  D &G also asserted that approximately seventy
> percent of its customers bought Chromalox products and losing the
> product line would necessitate lay-offs for a third of its employees.
> However, D & G would likely continue in the event that the contract
> with Chromalox is allowed to terminate.  The many other product

> lines that D & G markets as well as the ability to now market
> products that compete with Chromalox indicate that irreparable harm
> has not been established.

*Dittman & Greer, Inc. V. Chromalox, Inc., 2009 WL 3254481, at \*1* (D. Conn. Oct. 6,

2009).  The Court necessarily disagrees with the Defendant's application of

*Dittman*, as testimony and evidence reflects that the facts of this case are

distinguishable.  The harm to Country Fare is not easily calculable, while in

contrast, harm to Chromalox consisted of a calculable loss of the plaintiff's

business and the company was notably able to continue due to its many other

product lines.  In the instant case however, evidence reflects that Country Fare is

highly dependent upon sales of the Mainely Mulch product and that Country Fare

is unlikely to survive if the injunctive relief is not provided.  Moreover, the Court

in *Dittman* did not specifically address whether the plaintiff would suffer a loss in

goodwill.  Here, the reputational harm to Country Fare and loss of goodwill with

its customers is the Plaintiff's principal claim.  The loss of goodwill occasioned

by the failure to deliver a seasonal product such as mulch cannot be easily

calculated.  Accordingly monetary damages upon final resolution of the dispute

cannot fully compensate Country Fare for its lost business, reputation and

goodwill.  Given the seasonal nature of the product at issue, customers of

Country Fare would likely purchase mulch from another vendor rather than risk

non-delivery and the narrow window for window of sales opportunities in the

future.  *O.D.F. Optronics Ltd. v. Remington Arms Co., Inc.,* 2008 WL 4410130, at \*6

(S.D.N.Y. Sept. 26, 2008)("Irreparable Harm is found where, "but for the grant of equitable relief, there is a substantial chance that upon final resolution of the action the parties cannot be returned to the positions they previously occupied")(quoting *Brenntag Int'l Chemicals, Inc. v. Bank of India*, 175 F.3d 245, 249 (2d Cir. 1989)).  The Court therefore finds that the Plaintiff has satisfied the "irreparable harm" prong of the analysis that traditionally applies to motions for preliminary injunction and both the irreparable harm and inadequacy of available remedies at law prongs of the analysis identified in *Salinger*.

### Likelihood of Success on the Merits

The Plaintiff contends that it has established a likelihood of success on the merits based on evidence that the Defendant obtained the Mainely Mulch mark through fraud by purposefully presenting sample specimens that obliterated references to Country Fare misrepresenting its prior use, and by seeking the trademark despite knowledge that Country Fare was the true holder of the trademark as reflected by the terms of a ten year vendor agreement entered into by Country Fare and Lucerne in 1999, and behavior indicating that Country Fare stood behind the brand and was regarded as responsible for the quality of the products.

In turn, Lucerne contends that Country Fare "has not carried its burden of demonstrating it has a likelihood of both success on the merits of its claims of

13

ownership of the Mainely Mulch mark and cancellation of Lucerne's 2004 registration fo the mark" and Lucerne further asserts that it is responsible for the unique features of Mainely Mulch and that the distribution agreement reflects that Lucerne controlled Country Fare as distributor and obtained registration of the mark on the basis of good faith belief in the ownership of the mark as opposed to fraud.

> To raise a successful defense of fraud under 15 U.S.C. § 1115(b)(1) the allegedly fraudulent statements must show a deliberate attempt to mislead the Patent and Trademark Office and may not be the product of an error or inadvertence.  The fraud must be proven by clear and convincing evidence.  Courts and the Trademark Board have held that this disfavored defense must be proven to the "hilt" by the party alleging the fraud.

*E. Gluck Corp. v. Rothenhaus*, 585 F. Supp. 2d 505, 513 (S.D.N.Y., 2008) (internal citations and quotation marks omitted).

Although a high burden applies to the Plaintiff's claim that Defendant committed fraud on the Trademark Office, the Court finds that the Plaintiff has clearly met its burden of persuasion of its likelihood of presenting clear and convincing evidence that the Defendant secured a trademark to the "Mainely Mulch" mark through fraud, as reflected by testimonial evidence and supporting exhibits, evincing that the Plaintiff had clear rightful ownership to the "Mainely Mulch" trademark and that the Defendant made material misrepresentations in its application  to the Trademark Office for that mark despite its knowledge of the Plaintiffs rightful ownership of the mark.

In arriving at this conclusion, the Court first notes that the evidence clearly

indicates that the Plaintiff had ownership of the mark.  First, the 1999 agreement includes clear references to Mainely Mulch as a Country Fare product as it states in its third whereas clause that: "Lucerne will continue manufacturing/packaging of Country Fare's product called 'Mainely Mulch' and all substantially similar products exclusively for Country Fare LLC. . ." [Plaintiff's Exh. 1-D].  *See Premier Dental Products v. Darby Dental Supply*, 794 F.2d 850, 854 (3d Cir. 1986) (noting that "ownership of a trademark as between a manufacturer and an exclusive distributor is largely determined by the parties' agreement.").

Further, the relationship between Country Fare and Lucerne indicates that Country Fare had superior ownership of the mark.

> As a general rule, where a manufacturer and exclusive distributor contest the ownership of a trademark and no agreement controls, it is the manufacturer who presumptively owns the mark. . . . However, where as here, the "goods pass through [the distributor's] hands in the course of trade and [the distributor] gives them the benefit of [its] reputation or [its] name and business style" this presumption may be rebutted.  In order to determine superior ownership a court should consider the following factors: (1) which party invented and first affixed the mark on to the product, (2) which party's name appeared with the trademark; (3) which party maintained the quality and uniformity of the product; and (4) with which party the public identified the product and to whom purchases made complaints.

*Tactica International v. Atlantic Horizon International*, 154 F. Supp. 2d 586, 600 (S.D.N.Y., 2001)(citing *Sengoku Works Ltd. V. RMC Int'l Ltd.*, 96 F.3d 1217, 1220 (9th Cir. 1996) and *IMAF, S.P.A. v. J.C. Penney Co., Inc.* 806 F. Supp. 449, 454 (S.D.N.Y. 1992)); *See also Premier Dental* 794 F.2d at 854 (noting that "[i]f the public believes that the exclusive distributor is responsible for the product, so

15

that the trademark has come, by public understanding, to indicate that the goods bearing the trade-mark come from the plaintiff although not made by it[,] or if the distributor has obtained a valuable reputation for himself and his wares by his care in selection of his precautions as to transit and storage, or because his local character is such that the article acquires value by his testimony to its genuineness, that is proof that he possesses the goodwill associated with the product.) (internal citations and quotation marks omitted).

In this case, the Plaintiff provided testimonial evidence from Auerbach and Frederick Stecher, Country Fare's General manager, establishing that Country Fare conceptualized all aspects of Mainely Mulch including its composition, name, design, labeling and marketing.  More specifically, the testimony reflected that the Plaintiff created and affixed the mark to the product as Country Fare paid over $2,000 for the "plates" used for the logo and design imprinted on the bags in which the Mainely Mulch product was sold beginning in 2002.  Further, Country Fare's name appeared in conjunction with the mark on the product, and Country Fare printed a "TM"on the packaging expressly in order to protect its right to the trademark.  Testimony further reflected that Country Fare was responsible for maintaining the quality of the product and was held accountable to the public for the quality of the product even by the Defendant which forwarded complaints and concerns regarding the quality of the product to Country Fare disavowing that it was accountable for product quality.  The Plaintiff therefore squarely meets the test identified in *Tactica International* and had a superior ownership to the mark

that would have been clear to Lucerne at the time of its trademark filing.

Additionally, while the 1999 Agreement imposed sales quotas on Country Fare, this quota does not establish the Defendant's ownership of the mark as witness testimony reflected that the quota was designed to address Lucerne's need to utilize the manufacturing capacity of machinery owned and greatly underutilized by Lucerne prior to entering the distribution contract with Country Fare. Lastly, the Defendant's submission of a "Heads of Agreement" on December 17, 2009 [Defendant's Exhibit 1-F] does not alter the Court's interpretation of the parties' relationship as the document is unsigned and therefore there is no indication that Country Fare ever agreed to its proposed terms. On the contrary, to the extent it was proferred by Lucerne and rejected by Country Fare, it has the opposite effect.

The Court in turn concludes that the Plaintiff is likely to succeed on the merits because Country Fare's rightful claim to the trademark would have been apparent and clear to Lucerne at the time it filed its application with the Trademark Office, particularly as Country Fare's ownership of the mark was clearly delineated in the parties' 1999 agreement, established through the nature of the parties' respective relationships with the product, and reflected by the designs that appeared on the bag itself which identified Mainely Mulch as a Country Fare product. The Court therefore concludes that Country Fare has proved by clear and convincing evidence that Lucerne's submissions to the Trademark Office were not made in good faith and were not a result of an honest

17

misunderstanding particularly as Lucerne provided specimen's that actively concealed any and all identifying information relating to the Plaintiff even though Lucerne asserted that the specimens reflected a mark that Lucerne had used in commerce for five consecutive years prior to the filing.

The Court's finding that the Plaintiff is likely to succeed on the merits is not disturbed by the Defendant's filing of the Declaration of Kevin Haley nor by Haley's responses to supplemental interrogatories as his responses note that his representations to the Trademark office were dependent upon representations made to him by George James, the President of Lucerne and that Haley was not aware nor  privy to firsthand information such as the contract governing the parties' agreement as to the product, the Plaintiff's payment for and ownership of the plates necessary for the printing of the Mainely Mulch bags used in commerce, the bag's reference that the product was "DEVELOPED AND EXCLUSIVE [sic] DISTRIBUTED BY" Country Fare LLC, and the extent to which either Lucerne or Country Fare maintained the quality of the product, and which party handled complaints relating to the product.  The Court notes that hearsay is admissible in a hearing on a preliminary injunction and thus the strict standards for affidavits under the Federal Rules of Evidence and in support of summary judgement under Fed. R. Civ. P 56(c)(4) requiring that an affidavit be made on personal knowledge are not expressly applicable to affidavits in support of preliminary injunctions.  *Mullins v. City of New York*, 634 F. Supp. 2d 373, 384 (S.D.N.Y. 2009).  Courts have wide discretion to assess the affidavit's credibility

and generally consider affidavits made on information and belief to be insufficient for a preliminary injunction. 11A Charles Alan Wright et al., Federal Practice and Procedure § 2949 (2d ed. 1995); *Mullins v. City of New York*, 634 F. Supp. 2d at 373, 385, 390 n.115 (declining to fully credit "defendants' hearsay affidavit" and noting that while the court "may consider hearsay evidence in a preliminary injunction hearing.  Nevertheless, a court may weigh evidence based on whether such evidence would be admissible under the Federal Rules of Evidence."). Since the Declaration of Kevin Haley was made on unidentified and unsubstantiated information and belief and not on Mr. Haley's personal knowledge, the Court finds his declaration unpersuasive.

The Court therefore is not dissuaded from its conclusion that the Plaintiff has demonstrated a likelihood of success, as the Defendant has not credibly disrupted evidence that Lucerne, as an entity, had clear knowledge of the Plaintiff's right to the mark and therefore made a material misrepresentation when it instructed its trademark attorney to file for the mark even if Haley himself was unaware of the falsity.  As noted, knowledge of the filing's falsity is evinced by the fact that a specimen of the Mainely Mulch package was presented to the Trademark Office in a manner that strategically omitted all references to Country Fare that existed on the bag that was actually used in commerce by Country Fare prior to, and at the time of the Defendant's application.  Further, Lucerne misrepresented that the altered bag had been used by it in commerce when in fact it had not been.

19

## Balance of the Hardships and Consideration of the Public Interest

Additionally, the Court finds that assuming but not deciding that the standard in *Salinger* applies, the Plaintiff has met its burden as to that standard's final two prongs as the Plaintiff has shown that the balance of hardships tips in its favor and that the public interest would not be disserved, by the issuance of a preliminary injunction.  The Court has already explained that the Defendant's actions, if not enjoined will likely result in irreparable harm to the Plaintiff and that the Plaintiff is likely to succeed as to the merits of its case.  The Defendant in turn alleges that, assuming that it has rightful claim to the Mainely Mulch trademark, the Plaintiff's product will cause harm to the Defendant because the Plaintiff's Mainely Mulch product, as currently manufactured, is of inferior quality. In support of this assertion, the Defendant provides a laboratory report that it asserts was conducted by Maine Environmental Services Inc. and concludes that weeds grow out of the Plaintiff's current Mainely Mulch product, manufactured by Semican, at a significantly greater extent than mulch manufactured by Lucerne. The Court finds this argument unavailing as the report does not include a descriptive protocol for the experiment.  The report provides minimal context and discussion of the extent to which any relevant variables were controlled.  The Court therefore finds that the laboratory study lacks credible, probative value. Further, even assuming the Plaintiff's product is of inferior quality, the strong if not overwhelming evidence that the Plaintiff has rightful ownership to the mark, and the fact that the Defendant does not seek to sell the mulch product under the

20

name "Mainely Mulch" has chosen to sell mulch under the name "Lucerne Farms Premium Ground Cover" in the immediate future, underscores that the balance of hardships tips in the Plaintiff's favor.

Additionally, while the Defendant attempted to estimate Country Fare's annual profits through sales of the Mainely Mulch product, the Defendant has offered very little to no evidence regarding actual damages that it would suffer as there is no indication that Lucerne had sold in the past or had plans to sell in the future the Mainely Mulch product in commerce.  Additionally, the Court finds that the balance of hardships tips in the Plaintiff's favor as the Court can instruct Country Fare to provide security in an amount that would "pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  Fed. R. Civ. P. 65(c).

Lastly, the Court sees no reason why the public interest is disserved by the issuing of this preliminary injunction, and to the contrary finds that the public interest is served by such an injunction against the assertion of what at this preliminary stage clearly and convincingly appears to be wrongful and fraudulent claims to a right to a trademark.

## Preliminary Injunction Bond

Under Fed. R. Civ. P. 65(c), the Court has wide discretion to determine the appropriate amount of an injunction bond.  *Doctor's Assocs., Inc. v. Distajo*, 107 F.3d 126, 136 (2d Cir. 1997)("Rule 65(c) gives the district court wide discretion to

set the amount of a bond, and even to dispense with the bond requirement 'where there has been no proof of likelihood of harm.'") (citations omitted).  The Second Circuit has noted that "[s]ince a preliminary injunction may be granted on a mere probability of success on the merits, generally the moving party must demonstrate confidence in his legal position by posting bond in an amount sufficient to protect his adversary from loss in the event that future proceedings prove that the injunction issued wrongfully."  *Nokia Corp. v. InterDigital, Inc.*, No. 10-1358-cv, 2011 WL 1944309, at *3 (2d Cir. May 23, 2011)(citing *Edgar v. MITE Corp.*, 457 U.S. 624, 649 (1982)).

        The Defendant notes that if the Court ultimately determines that it is the rightful owner of the mark it would be entitled to damages from Country Fare under 15 U.S.C. § 1117(a) for trademark infringement of (i) profits made by Country Fare due to wrongful use of the mark, (ii) damages sustained by Lucerne, and (iii) Lucerne's costs in connection with this action, plus attorney's fees in an exceptional case. [Doc. #33].  The Defendant asserts, based on Auerbach's testimony, that Country Fare's net profit ranged between $203,811.96 and $254,764.95, however the Defendant's estimate does not properly account for Country Fare's costs in connection with the production of Mainely Mulch.  [Doc. #33].  Auerbach testified that Country Fare had historically made $30,000 to $40,000 in annual gross profit.  However in supplemental briefing before the Court, Country Fare detailed that its estimated annual net profit for 2011 would be $1,640.34.  This estimate is based on Country Fare's most recent projection that

22

Mainely Mulch would comprise 69% of its gross sales for 2011 and factors in the increased costs that resulted from its new manufacturing agreement with Semican as well as its recent price reductions for Mainely Mulch.  [Testimonial Declaration of Jeffrey Auerbach Doc. #38].  While there is no evidence that Lucerne is currently selling its own version of Mainely Mulch on the market, but instead selling "Lucerne Farms Premium Ground Cover," the harm it will suffer from being wrongfully enjoined is the value that Country Fare will obtain from using Lucerne's trademarked Mainely Mulch brand.

Lucerne also argues that it will be further harmed by Country Fare selling an inferior product under its Mainely Mulch trademark and accordingly should be provided with additional security.  However, as the Court previously explained the evidence Lucerne relies on for this assertion is not probative as the scientific study simply reports the results of a "Phytotoxicity/Seedling Trial" with no explanation or description of the scientific process or methodology utilized. [Defendants' Ex. I. Doc. #22, Attach. 10. ].  Lastly, Lucerne contends that it is entitled to its costs in connection with this action plus attorney's fees. [Doc. 33]. However, attorney's fee are not recoverable as damages in an action on an injunction bond.  *Nokia*, 2011 WL 1944309, at *5; *Universal City Studios, Inc. v. Corley*, No. 00Civ.277, 2000 WL 621120, at *5 (S.D.N.Y. May 12, 2000).

Based on the foregoing analysis, Lucerne should be entitled only to a disgorgement of whatever net profit Country Fare makes from selling Mainely

Mulch throughout the duration of the preliminary injunction.  The Court therefore instructs the Plaintiffs to either provide security in the amount of $5,000, which reflects Country Fare's historical net profits of $30,000 to $40,000 as well as its 2011 estimated net profits of $1,640.34 for Mainely Mulch, or in the alternative place into escrow all net profit made from the sell of Mainely Mulch pending the duration of the preliminary injunction and provide on a quarterly basis a detailed accounting to Defendant.  *See Alpha Capital Atiengesellschaft v. Advanced Viral Research Corp.*, No. 02 CV 10237, 2003 WL 328302, at *6 (S.D.N.Y. Feb. 11, 2003) (in an action seeking a preliminary injunction on behalf of holders of stock warrants against defendant corporation which had refused to deliver shares, the court ordered that in addition to a bond, which reflected the value of the shares, that plaintiffs place into escrow pending final resolution of the dispute any proceeds of warrant stock subsequently sold by Plaintiff).  The Court also instructs Defendant to provide Plaintiff with the required authorization letters to the United States Customs and Border Protection ("Customs") with a preliminary set end date of June 7, 2013.  In the event, there is a final resolution of the dispute prior to June 7, 2013 the parties shall provide Customs with appropriate letters to that effect.  In the event there is not a final resolution by June 7, 2013, the parties shall extend the authorization for another 6 months and thereafter seek leave from the Court for any further extensions if warranted.

24

Based on its review of the materials submitted, the Court grants the [Doc.

#3] Plaintiff's Motion for Preliminary Injunction.

IT IS SO ORDERED.

_____/s/_____

Hon. Vanessa L. Bryant

United States District Judge

Dated at Hartford, Connecticut: June 7, 2011.

25